**STATE OF ARIZONA, Petitioner,**

v.

**Lee M. THOMAS, Administrator, U.S. Environmental Protection Agency, Respondent.**

**No. 86–7693.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 14, 1987.

Decided Oct. 2, 1987.

See also, 9th Cir., 824 F.2d 745.

Paige Murphy-Young, Phoenix, Ariz., for petitioner.

David W. Zugschwerdt, Washington, D.C., for respondent.

Howard J. Hoffman, Washington, D.C., for the EPA.

Before SCHROEDER and POOLE, Circuit Judges, and SMITH,* District Judge.

PER CURIAM:

The State of Arizona petitions this court pursuant to 42 U.S.C. § 7607(b)(1) to set aside the action taken by the Administrator of the Environmental Protection Agency (Administrator) in disapproving Arizona's Clean Air Act implementation plans and imposing mandatory sanctions on construction of new carbon monoxide pollution sources. The EPA took the action pursuant to section 7410(a)(2) of the Act which gives it authority to approve and disapprove plans, and pursuant to section 7506(a) which mandates sanctions in case of disapproval. The EPA found that Arizona had failed to produce a plan which would demonstrate timely attainment of the air quality standard for carbon monoxide.

In this litigation Arizona does not dispute the underlying EPA findings, as required by section 7506(a), that the state had not submitted an implementation plan meeting the statutory requirements and that it had failed to make reasonable efforts toward submitting such an implementation plan. Rather, Arizona argues that by virtue of certain language in EPA regulations, the EPA was required as a matter of law to treat Arizona as if it had been implementing a fully-approved plan. Arizona argues

that the required administrative response in this circumstance was to require the state to submit a new plan. The record in this case reflects dealings between the State of Arizona and the EPA over a course of eight years during which both sides knew that no satisfactory plan had ever been submitted. Arizona's position therefore cannot be sustained. We uphold the decision of the Administrator.

I

STATUTORY AND REGULATORY FRAMEWORK

A. *The Clean Air Act*

The Clean Air Act requires each state to submit a State Implementation Plan (SIP) to the Administrator of the EPA for review and approval. 42 U.S.C. § 7410(a)(1). The SIP is the state's plan for reducing the levels of certain air pollutants in the ambient air to those prescribed by the National Ambient Air Quality Standards (NAAQS).[1] 42 U.S.C. § 7409(a), 7410(a)(2)(B). The Administrator must approve a SIP if it meets the criteria set forth in 42 U.S.C. § 7410(a)(2)(A)–(H).

Because many states failed to attain the NAAQS by the target date of 1975, Congress amended the Clean Air Act in 1977 by adding Part D to Title I of the Act. 42 U.S.C. § 7501–08. Part D applies only to areas that have yet to attain the NAAQS (nonattainment areas).[2] Under Part D these nonattainment areas must adopt and submit, by January 1, 1979, SIP revisions (1979 SIPs) to the Administrator for his review and approval. The 1979 SIPs were to provide for attainment of most of the NAAQS not later than December 31, 1982, and for implementation of all reasonably available control measures as expeditiously

---

* Honorable Russell E. Smith, Senior United States District Judge, District of Montana, sitting by designation.

1. For a more detailed discussion of implementation plans and the nature of the NAAQS, *see Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1290 n. 1 (9th Cir.1977).

2. Section 7501(2), title 42 U.S.C., defines the term "nonattainment area" for any air pollutant as

an area which is shown by monitored data or which is calculated by air quality modeling [or other reliable methods] to exceed any national ambient air quality standard for such pollutant.

836

as possible.[3] 42 U.S.C. §§ 7502(a)(1) and (b)(2). Any state that did not have an approved SIP providing for primary NAAQS attainment not later than the end of 1982 was subject to a moratorium on the construction of new "major stationary sources" of pollution and on the "major modification" of existing major sources in nonattainment areas. 42 U.S.C. § 7410(a)(2)(I).

Part D contains a separate attainment deadline applicable only to carbon monoxide (CO) and ozone nonattainment areas. 42 U.S.C. § 7502(a)(2). Section 7502(a)(2) provides that a 1979 SIP fulfills the requirements of Part D "if the state demonstrates to the satisfaction of the Administrator ... that [NAAQS] attainment is not possible in an area with respect to either or both [CO and ozone] within the period prior to December 31, 1982, despite the implementation of all reasonably available measures." The provision further requires the state to submit another revised SIP (an extension SIP) to "provide for the attainment" of the NAAQS as expeditiously as practicable, but not later than December 31, 1987.

Thus under Part D of the statute, states were required to submit SIPs which provided for attainment of carbon monoxide and ozone standards by 1987 and all others by 1982. In addition, Part D provides that where the EPA Administrator finds that a state has not submitted, or is not making reasonable efforts to submit, an approvable 1979 SIP or Extension SIP, the Administrator must impose cutoff of federal highway construction and Clean Air Act implementation grants. 42 U.S.C. § 7506(a).

## B. *EPA's Part D Rulemaking: The Compliance Policy*

On February 3, 1983, the EPA issued a rulemaking proposal relating to implementation of Part D. 48 Fed.Reg. 4972–5021. The first rulemaking proposal sought to impose the construction ban on nonattainment areas that had failed to attain the NAAQS by December 31, 1982. This sanction was originally to apply even to those areas that had fulfilled their Part D planning obligations and possessed fully-approved SIPs.[4]

In November 1983 the EPA revised its February 3 proposal in response to widespread objections by the states and Congress. 48 Fed.Reg. 50686–50697 (Nov. 2, 1983). Essentially, EPA retracted its proposal to impose automatic construction bans on those areas with fully-approved SIPs that failed actually to attain NAAQS. *Id.* at 50690–91. EPA was persuaded that section 7410(a)(2)(I) and Part D "were intended to produce revised plans that appeared to 'provide for' attainment by the 1982 or 1987 deadlines," not to guarantee actual attainment in fact. *Id.* at 50691. SIPs are planning documents. Thus, the result of the EPA's final revised rulemaking was to exclude from the automatic construction ban sanction any area that fulfilled its planning obligations (as evidenced by a fully-approved SIP), but failed to attain the NAAQS by the end of 1982. *Id.* The proper EPA response to implementation failures (*i.e.,* failures to attain the NAAQS) is the "SIP call." *Id.* at 50693. A SIP call is simply a request by EPA to the nonattainment state to submit a revised SIP detailing a plan for attainment in accordance with the Clean Air Act.

**3.** Section 7502(b), Title 42 U.S.C., lists the provisions that a SIP must include in order to avoid a construction moratorium. It provides that a SIP shall require "reasonable further progress ... including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology." 42 U.S.C. § 7502(b)(3). Furthermore, a SIP must include "written evidence that the State ... [has] adopted by statute, regulation, ordinance, or other legally enforceable document, the necessary requirements and schedules and timetables

for compliance, and [is] committed to implement and enforce the appropriate elements of the plan." *Id.* at § 7502(b)(10).

**4.** The EPA issued another NAAQS rulemaking on the same date. *See* 48 *Fed.Reg.* 5022–5149. The rulemaking proposal described in the text is the only one relevant here. The other rulemaking proposal consisted of proposals to approve or disapprove Extension SIPs for various other nonattainment areas.

**II**

**AGENCY PROCEEDINGS
INVOLVING ARIZONA**

The essence of Arizona's position in this case is that under the final 1983 rulemaking, the EPA should have treated Arizona as if it had fulfilled all of its existing planning obligations. The record of administrative proceedings demonstrates that this position is not sustainable.

Arizona's two urban counties are Maricopa (Phoenix) and Pima (Tucson). Both were nonattainment areas at the time of passage of the 1977 amendments, and thus both were subject to the provisions of Part D. The administrative history for both follows roughly parallel tracks. A more detailed chronology is set forth in the margin.[5] What follows here is a capsule summary of key events.

5. A. *Maricopa County*

| | |
|---|---|
| March 3, 1978: | Maricopa County designated as nonattainment for CO. *Id.* at 33746. |
| July 1, 1979: | Because Maricopa had no approved 1979 SIP, a construction ban was triggered on this date. |
| October 22, 1980: | EPA proposed to conditionally approve the Maricopa 1979 SIP. The condition was the remedying of certain deficiencies in the new source review (NSR) requirements. 45 *Fed. Reg.* 70006 (October 22, 1980). |
| October 30, 1980: | Arizona submitted a 1987 extension request. |
| February 5, 1982: | EPA proposed to approve Arizona's extension request on the basis of Arizona's demonstration that attainment of the CO NAAQS was not possible before December 31, 1982. 47 *Fed. Reg.* 5439 (February 5, 1982). |
| May 5, 1982: | Administrator conditionally approved the Maricopa 1979 SIP and lifted the construction ban. 471 *Fed. Reg.* 19328 (May 5, 1982). |
| October 28, 1982: | Arizona submitted to EPA its proposed Maricopa Extension SIP. |
| June 3, 1982 & March 4, 1983: | Arizona submitted revised NSR regulations. |
| July 28, 1983: | EPA proposed to approve the revised NSR regulations, with one exception and certain understandings. 48 *Fed. Reg.* 34293 (July 28, 1983). |
| February 24, 1984: | EPA's Regional Administrator informed Governor Babbitt that Arizona's 1979 SIP for Maricopa was not adequate to attain the CO NAAQS by December 31, 1982. Arizona was then warned that failure to submit an approved 1987 Extension SIP would result in a construction ban (Rec. Doc. 40A). |
| January 27, 1986: | EPA proposed to find that the 1979 SIP, as revised by various submissions, did not meet the part D planning obligations. 51 *Fed. Reg.* at 3343–45 (January 27, 1986). |
| March 12, 1986: | Arizona sent a letter to EPA Regional Administrator contending that a construction ban was inappropriate (Rec. Doc. 43). |
| September 23, 1986: | Administrator confirmed the proposal to disapprove Arizona's SIPs. 51 *Fed. Reg.* at 33747. |
| November 20, 1986: | Arizona files petition for review in this court. |

B. *Pima County*

| | |
|---|---|
| March 3, 1978: | Pima County designated as nonattainment for CO. 51 *Fed. Reg.* at 33748. |
| July 23, 1980: | EPA proposed to conditionally approve the Pima 1979 SIP pending submission of revised NSR regulations and schedules for implementation of certain transportation control measures (TCM). 45 *Fed. Reg.* at 49114 (July 23, 1980). |

Both Maricopa and Pima counties were designated as nonattainment areas in 1978 and the state of Arizona subsequently submitted a 1979 SIP for both. In the summer and fall of 1980, the EPA proposed conditional approval of the SIPs pending cure of certain deficiencies unrelated to the carbon monoxide and ozone attainment standards. Soon after that announcement (within eight days in the case of Maricopa County) the state asked for an extension to meet the CO standards. It was apparent that the 1979 SIP would not produce the desired result by 1982.

## DISCUSSION

In this petition for review of the Agency disapproval of the plans, Arizona does not ask us to address the scientific merits of the Administrator's decision. The noncompliance of its plans with required standards is assumed. Arizona's position, in a nutshell, is that by virtue of the EPA's original conditional approval of the plans and the apparent fulfillment by the state of those particular conditions, the state should be regarded as having actually submitted plans which appeared to meet all requirements of the Act. It asks us to ignore the actual history, which shows that from 1980 on, Arizona and the EPA knew that the

plans were deficient in the area of CO attainment.

Arizona's argument is based upon the language of EPA's policy promulgated in November of 1983 to implement Part D of the Clean Air Act. As discussed earlier, in that policy the EPA relaxed its previously announced approach to states which had submitted plans which appeared to meet the requirements but in fact did not do so. It said that "where a fully approved Part D plan failed to bring about attainment by the end of 1982, EPA will treat the plan as 'substantially inadequate' ... and call for a SIP revision." 48 Fed.Reg. 50693. EPA announced that it would not treat the plans as having been disapproved and thereby trigger the automatic sanctions.

Arizona, of course, never had plans for Maricopa and Pima counties which appeared to meet all the requirements, much less plans which had been fully approved. Arizona nevertheless argues that it should be subject to a new SIP call as if it submitted a satisfactory plan. Because the EPA at one point announced conditional approval of Arizona's plans, Arizona looks to a small paragraph of the policy referring to areas with conditionally-approved plans. That paragraph states:

Many areas with conditionally approved plans also failed to attain by the end of

B. *Pima County*—Continued

March 28, 1982: Arizona submitted the TCM implementation schedules. 47 *Fed. Reg.* at 29533 (July 7, 1982).

May 24, 1982: Arizona submitted a 1987 extension request for Pima County.

July 7, 1982: Administrator conditionally approved the Pima 1979 SIP.

February 3, 1984: Arizona submitted an Extension SIP for Pima County.

February 24, 1984: EPA's Regional Administrator informed Governor Babbitt that Arizona's 1979 SIP for Pima was not adequate to attain the CO NAAQS by December 31, 1982. Arizona was then warned that failure to submit an approved 1987 Extension SIP would result in a construction ban (Rec. Doc. 40A).

January 27, 1986: EPA proposed to find that the Pima 1979 SIP, as revised by the Pima Extension SIP, did not meet the requirement of providing for attainment as expeditiously as practicable. EPA imposed a construction ban. EPA also proposed to deny the Extension SIP as untimely. 51 *Fed. Reg.* 3346–47 (January 27, 1986).

March 12, 1986: Arizona sent a letter to EPA Regional Administrator contending that a construction ban was inappropriate (Rec. Doc. 43).

September 23, 1986: Administrator confirmed the proposal to disapprove Arizona's SIPs. 51 *Fed. Reg.* 33746–33749.

November 20, 1986: Arizona files petition for review.

1982. Fulfilling the condition may not be enough to bring about attainment as expeditiously as practicable. These areas will need to submit further plan revisions following the guidelines above for areas that failed to attain.

*Id.*

Arizona correctly points out that the "guidelines" referred to in the last sentence are those guidelines which are to apply to areas with fully-approved plans that have failed to attain in fact the NAAQS by December 31, 1982. From this, Arizona argues that the EPA regards as fully approved all conditionally-approved plans where the condition has been satisfied. According to Arizona, because it has satisfied the EPA-imposed conditions to the Maricopa and Pima County SIPs, EPA violated the provisions of its Compliance Policy when it disapproved the Arizona SIPs. Arizona thus asks us to hold that EPA acted "contrary to law" within the meaning of Administrative Procedure Act's provisions subjecting administrative decisions to judicial disapproval for decisions which are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(c)(2)(A); *Western Oil & Gas Ass'n v. EPA*, 767 F.2d 603, 605–06 (9th Cir.1985).

It is obvious to us, however, upon reviewing the entire regulation against the background of Arizona's dealings with the EPA, that the regulation does not compel the strange result which Arizona seeks. Having failed in its obligation to produce or make reasonable efforts to produce SIPs which would appear to meet the requirements of the Act, Arizona should not be given another opportunity to produce more plans. The provisions in the Compliance Policy directing a new SIP call as opposed to sanctions were exclusively for areas that had failed to achieve attainment despite a plan which appeared to do the trick. Arizona nonattainment areas never had such a plan. Congress intended EPA to disapprove SIPs with evident planning deficiencies, even if full approval had once been granted. *See New Mexico Environmental Improvement Division v. Thomas*, 789 F.2d 825, 830–31 (10th Cir.1986).

Recently, this court upheld EPA's disapproval of Arizona's proposed new source review for TSP, and the concomitant ban on TSP source construction. *Arizona v. Thomas*, 824 F.2d 745, 749 (9th Cir.1987). This court noted that the EPA must enforce the standards of the Clean Air Act and highlighted the EPA's need for flexibility in doing so. *Id.* ("[T]he EPA should be granted flexibility in enforcing the complex provisions of the Clean Air Act.").[6] In

---

**6.** In that case this court held that Arizona's earlier challenge to an earlier EPA disapproval of Pima County's SIP was moot. This holding does not affect the issue presented here, for we are concerned with a subsequent disapproval on different grounds. This can be explained as follows.

On July 7, 1982, EPA approved Pima County's SIP subject to the condition that Arizona submit revised regulations meeting EPA's NSR requirements. *See supra* note 5. In October 1985, Arizona submitted the amended NSR regulations as required by the EPA. *Arizona v. Thomas*, at 747. Under the impression that only 900 square miles within Pima County were nonattainment, Arizona's submission applied only to those 900 square miles. *Id.* EPA, on the other hand, designated 2,000 square miles as nonattainment. Because 1,100 square miles remained unaccounted for by Arizona's amended NSR regulations, EPA rejected Pima County's SIP revision. *Id.* Arizona continued to urge EPA to reconsider its view that the entire nonattainment area within Pima County covers 2,000 square miles. Arizona's entreaties induced the

EPA, on August 4, 1986, to accept Arizona's original view that only 900 square miles were nonattainment. EPA then redesignated the remaining 1,100 square miles from nonattainment to attainment. 51 Fed.Reg. 27843; *see Arizona v. Thomas*, at 748. This redesignation prompted EPA to retract its earlier disapproval of the Pima County SIP.

As a result of this redesignation, as of August 4, 1986, the construction ban earlier imposed upon Pima County was lifted from the 1,100 square mile area because it was redesignated as a fully-attained area for CO, and from the 900 square mile area because it remained a conditionally-approved nonattainment area. Thus, Arizona's challenge to the EPA's disapproval of its Pima County SIP was moot because the redesignation resulted in the lifting of the construction ban. Subsequent to this redesignation, EPA disapproved the Pima County SIP, which only applied to the 900 square mile nonattainment area. It is that action, wholly distinct from the August 4, 1986 redesignation by EPA, that is challenged here. As EPA points out in the challenged rulemaking, 51 Fed.Reg. at

enforcing the Clean Air Act, the EPA distinguishes between planning obligations and implementation obligations. The EPA has not acted arbitrarily or capriciously in reserving the SIP call procedure for those circumstances where an area with a fully-approved plan fails adequately to implement. In the case of Maricopa and Pima County, the Part D planning obligations were never met; thus, they never reached the implementation stage. Contrary to Arizona's contention, EPA's Compliance Policy does not mandate yet another SIP call for those areas that are still endeavoring to meet their planning obligations. *See* 48 Fed.Reg. at 50693; *see also* 40 C.F.R. § 52.24.

The Administrator did not violate the law when it disapproved Arizona's plans which were indisputably deficient.

The Administrator's decisions are upheld.

The petitions for review are denied.

33748, "[s]ince the redesignation removed [the 1,100 square miles] from the coverage of Part D, today's rulemaking on the Pima County Part D SIP does not affect [those 1,100 square miles]."